THE HONORABLE JOHN C. COUGHENOUR

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

HAROUNA FALL,

                    Plaintiff,

        v.

DELTA AIR LINES INC, a foreign
corporation, and JANE AND JOHN
DOES 1–5,

                    Defendants.

CASE NO. C15-919 JCC

ORDER GRANTING
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

This matter comes before the Court on Defendants' Motion for Summary Judgment (Dkt. No. 12). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby GRANTS the motion for the reasons explained herein.

## I.    BACKGROUND

Delta hired Plaintiff Harouna Fall, also known as Ron Fall, as a ramp agent in August 2010. (Dkt. No. 12 at 4.) Fall was already working as a ramp agent and supervisor when Delta took over the contract for his employment from another company. (Dkt. No. 14-1 at 4.) Delta promoted Fall to the lead agent position three or four months after hiring him. (Dkt. No. 12 at 4.) Lead agents are in charge of directing a crew of employees in various operations relating to the timely and safe loading and unloading of luggage from airplanes. (*Id.*) Over the course of his

1    employment, Fall experienced several incidents of friction with various co-workers and

2    subordinates that contribute to his bringing the above-captioned matter. The Court addresses

3    them one at a time below.

4    **A.    Prayer Mat Incident involving Rebecca Tuialuuluu**

5         Fall alleges that Rebecca Tuialuuluu threw away his prayer mat on Novermber 25, 2010.[1]

6    (Dkt. No. 15 at 2). Apparently there was pre-existing tension between Fall and Tuialuuluu,

7    beginning prior to their employment at Delta, because Fall believed Tuialuuluu was spreading

8    rumors about him. (Dkt. No. 14-1 at 14; Dkt. No. 13-4 at 4.) Tuialuuluu stated that she cleaned

9    out the bag room and removed trash from the room because the room was filthy with "grime and

10   trash everywhere," but indicated that she did not throw away a prayer mat. (Dkt. No. 13-4 at 4.)

11   She states that she removed a "plastic container tub" containing "trash and rotten food, candy

12   wrappers, used bingo sheets, loose suitcase straps, etc." (*Id.*) She further stated that it was later

13   brought to her attention that this is where the prayer mat was kept, but that she had no idea it was

14   in the container and did not throw the container away. (*Id.*) Additionally, when she recorded a

15   statement on November 30, 2010, five days after the alleged event, she asserted that Fall had not

16   asked her about the prayer mat. (*Id*.)

17        Contrarily, Fall stated that he went to the bag room to pray, he opened his drawer, but his

18   mat was not there. (Dkt. No. 14-1 at 15.) He says that he asked Tuialuuluu where his mat was,

19   and that she stated that she thought it was garbage and had thrown it away. (*Id.*) While Fall

20   suggests that Delta ignored the incident, employee records indicate that a Delta manager

21   conducted an investigation and counseled Tuialuuluu after the incident, reminding her that

22   "Delta employees must be professional at all times, treat others with respect, and any

23   inappropriate behavior or comments will not be tolerated." (Dkt. No. 13-4 at 7.)

24   **B.    Incident Involving Amin Rashid**

25

26
_____
[1] Fall testified that he references a prayer "mat" and a prayer "rug" interchangeably. (Dkt. No. 14-1 at 15.)

ORDER GRANTING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT
PAGE - 2

On December 12, 2010, a few weeks after the prayer mat incident with Tuialuuluu, Fall engaged in a conflict with Amin Rashid that turned violent. The incident began when Fall's subordinate, Rashid, accused Fall of telling management that Rashid was a bad worker and should not be promoted. (Dkt. No. 14-1 at 19–20.) Fall immediately reported the confrontation to manager Bill Green, who called Fall and Rashid into his office and told them, "Hey, I want you guys to work together. No fighting in the workplace." (Dkt. No. 14-1 at 20.)

Later that afternoon, Rashid again approached Fall, this time accompanied by three other Delta employees. (Dkt. No. 14-1 at 20.) Fall stated in his deposition that the four employees were verbally aggressive, making comments like "Mother F, I will F you" and "You are a liar, mother F. We will F you." (Dkt. No. 14-1 at 20.) Fall says that he responded by arguing back with the group, stating "You want to F me? Come on. I [will] F you too."[2] (Dkt. No. 14-1 at 21.) Fall states that they argued back and forth and then went home. (Dkt. No. 14-1 at 21.)

Following the incident, Corporate Security and Human Resources collaborated and conducted a full investigation, interviewing seven witnesses. (Dkt. No. 13-1 at 11.) During the investigation, Rashid and at least two witnesses reported that Fall grabbed Rashid's shoulder or jacket during the second confrontation. (Dkt. No. 13-1 at 14, 15, 17, 20.) Fall claims in his deposition that the group surrounded him and threatened to physically harm him. (Dkt. No. 14-1 at 19–20.) None of the witnesses, nor the investigatory report, corroborate Fall's version; rather, Rashid and the three others stated that they felt threatened because Fall said to Rashid that he would "fuck him up," followed by Fall speaking in a foreign language, and slapping his hands together." (Dkt. No. 13-1 at 14.) As a result of the incident, Delta suspended both Rashid and Fall pending investigation. (Dkt. No. 14-1 at 23.) Following investigation, Delta issued Fall a probationary letter on January 5, 2011, notifying Fall he was on a six-month probationary period, which required him to strictly comply with Delta's standards. (Dkt. No. 13-2 at 4.) Rashid was

---

[2] In his deposition it appears Fall used the letter "F" instead of stating "fuck," the actual word used during the incident. (*See* Dkt. No. 13-1 at 11) (stating Fall said "I'm going to f*ck you up.")

1   also issued a letter, although due to the finding that he did not aggressively instigate the

2   confrontation, Rashid was not placed on probation and instead was issued only a warning letter.

3   (Dkt. No. 13-2 at 3.)

4   **C.    First Incident Involving Jonathan Raab**

5        Fall's next factual allegation involves a comment made by Jonathan Raab in June 2011.

6   A Delta newsletter contained a photo of Fall and Raab, accompanied by the statement "[t]he

7   SEA Transfer Desk is run by ALA Ron Fal [sic] and assisted by ALA Jon Raab. They are the

8   primary leaders responsible for coordinating [several tasks]." (Dkt. No. 13-4 at 11.) Fall alleges

9   that after the newsletter was published, Raab approached him, his face red, and said "Mother F.

10  I'm not your F-ing assistant." (Dkt. No. 14-1 at 26.) Fall asked Raab what he was talking about,

11  to which he responded, "Oh this newsletter saying you—I am your assistant. F You." (*Id.*) While

12  Fall alleges that he complained about Raab's behavior, Delta states that it has not found any

13  record of any contemporaneous complaint and Fall has not produced one.[3] (Dkt. No. 12 at 11.)

14  **D.    Incident involving Scott Langford**

15       In July 2011, Fall caught his subordinate, Scott Langford, changing the labels on bags for

16  which Fall was responsible. (Dkt. No. 14-1 at 28–29.) Fall immediately reported the incident to a

17  manager, Bill Green, who asked Delta Manager Gail Drelling to handle the situation. Drelling

18  called Langford and Fall into her office to discuss the incident. (*Id.* at 29.) Lanford apologized to

19  Fall for the incident and Langford was formally disciplined. (*Id.* at 30.)

20  **E.    Incident Involving Ron Wooten**

21       On October 6, 2011, Fall instructed his subordinate, Ron Wooten, to go to a particular

22  belt to unload bags. (Dkt. No. 14-1 at 31.) Wooten said he did not want to go to that assignment

23  because the other employees working that belt did not like him. (*Id.* at 31.) Wooten continued to

24  argue with Fall, so Fall called Delta manager Drelling to assist him with the situation. (*Id.* at 32.)

25  _____

26  [3] Fall mentions this incident in an email in March 2012, about nine months after it allegedly occurred.
    (Dkt. No. 17-1 at 2.)

ORDER GRANTING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT
PAGE - 4

1   Drelling told Wooten that Fall is the boss and that he should follow Fall's instructions. (*Id.*)

2   In Drelling's presence, Wooten said to Fall, "F. You. You just—you just an African

3   working in a black diamond mine." (Dkt. No. 14-1 at 32.) Fall asked Wooten to repeat himself,

4   but Drelling told Wooten not to repeat the statement and instead reprimanded Wooten for the

5   comment. (*Id.*) After the incident, Wooten came to Fall, bent down on one knee, and asked Fall

6   to forgive him for the inappropriate comment. (*Id.*) Fall said, "I forgive you. This thing is over.

7   Let's work and go home." (*Id.* at 33.)

8   A few days later, Bill Green approached Fall and asked him to write a statement about

9   the incident because even though Fall had forgiven Wooten, the incident needed to be

10   investigated given the serious nature of the comments. (Dkt. No. 14-1 at 33; Dkt. No. 13-5 at 3.)

11   Green began an investigation and collected written statements from Wooten, Drelling, and Fall.

12   (Dkt. No. 13-5 at 2–5.) Afterwards, Green counseled Wooten for the inappropriate behavior and

13   ensured that Wooten understood that the diamond mine comment was out of line. (*Id.* at 8.)

14   Drelling was ultimately discharged for her failure to immediately investigate the incident. (Dkt.

15   No. 14-1 at 34–35.)

16   **F.    Second Incident Involving John Raab**

17   On January 16, 2012, Fall was involved in a second incident with Raab. Raab and three

18   other employees were waiting at a belt to unload bags when Fall approached them. (Dkt. No. 14-

19   1 at 36.) Raab told Fall that they did not need his help with the bags. (*Id.*) Fall replied, "I'm not

20   going nowhere. I'm here to do my job." (*Id.*) Raab and Fall began to exchange curse words and

21   some sort of physical contact occurred; while Fall claims that he did not push or touch Raab,

22   several witnesses made statements to the contrary. (*Id.* at 36–37; Dkt. No. 13-2 at 12, 14, 15, 16,

23   18.) Both Fall and Raab were suspended pending investigation. (Dkt. No. 13-2 at 18.) Fall

24   received a Final Warning Probation letter and placed him on six-month probation for "raising the

25   level of conflict to profanity and physical contact." (*Id.* at 20.)

26   **G.    Fall's Email to Delta Alleging Discrimination**

ORDER GRANTING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT

1       Fall alleges in his Complaint that he sent an email to Delta in February 2012, reporting

2 that his crew was short of employees because his white co-workers did not want to work with

3 him as their lead in the bag room. (Dkt. No. 4 at ¶ 11; Dkt. No. 14-1 at 38.) However, in his

4 email dated February 25, 2012, which appears to be the email Fall refers to, Fall does not

5 mention race—he does not mention the race of the other employees and he does not mention that

6 race was the basis for employees' decisions to choose certain assignments over others. (Dkt. No.

7 17-2 at 2.)

8 **H.**     **Incident Involving Elisabeth Blake**

9       On March 6, 2012, Elisabeth Blake filed a written complaint with Delta describing a

10 confrontation with Fall in the bag room where Fall yelled at her. (Dkt. No. 13-5 at 10.) Fall

11 alleges that the conflict began days earlier, on March 2nd, when Blake complained to a manager

12 that she did not want to work under Fall. (Dkt. No. 15; Dkt. No. 13-5 at 10, 11.) Fall states that

13 on March 2nd and March 4th Blake cursed at him, acted insubordinately, and said that she would

14 rather have John Raab as her manager. (Dkt. No. 16-6 at 1–2.) Fall suggests that Blake was

15 plotting to get him fired. (Dkt. No. 15 at 6.)

16       On March 6th, 2012, Blake stated that Fall walked up to her "with a really pissed off look

17 on his face" and began shouting at her. (Dkt. No. 13-5 at 10.) Other employees reported hearing

18 the shouting, but they could not discern the content of what was said or the person shouting.

19 (Dkt. No. 13-5 at 16, 18.) In light of the inconclusive information received, Delta took no

20 disciplinary action against either Fall or Blake. (Dkt. No. 14-1 at 39–40.)

21 **I.**     **Incident Involving Tracy Morrison**

22       On June 2, 2013, Fall was driving a bag cart when he nearly collided with Tracy

23 Morrison, a maintenance employee, who was driving a truck. (Dkt. No. 14-1 at 43.) Fall and

24 Morrison had never met prior to the near-collision. (*Id.* at 50.) Fall alleges that after the two

25 vehicles nearly collided, Morrison said some version of "F you. I will kill you." (Dkt. No. 14-1 at

26 43–44.) Morrison reported that he said, "slow down" and did not threaten Fall. (Dkt. No. 13-2 at

ORDER GRANTING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT
PAGE - 6

1    24; Dkt. No. 14-1 at 47.) Fall immediately reported the incident to a police officer[4] and Delta

2    management. (Dkt. No. 14-1 at 45–46.)

3           Management in Fall's department, Airport Customer Service, asked the management in

4    the maintenance department to participate in the investigation. (Dkt. No. 13-2 at 26.) Both Fall

5    and Morrison provided written statements. (Dkt. No. 13-2 at 22, 24.) The maintenance

6    department also provided a video of the incident, and the employee who took the video provided

7    a written statement corroborating Morrison's version of the events.[5] (Dkt. No. 13-3 at 2.) The

8    videographer zoomed the camera and observed Morrison walking up the jet way while Fall got

9    out of his vehicle, followed Morrison, and appeared to be yelling and pointing his finger at him.[6]

10    (Dkt. No. 13-3 at 2, 4). Both the videographer and Delta managers who viewed the video

11    concluded that it showed Fall approaching Morrison in an aggressive manner.[7] (Dkt. No. 13-3 at

12    5.) Fall claims that the video was altered and he contends that he did not aggressively approach

13    the vehicle. (Dkt. No. 13-3 at 5.) Following the investigation, management coached Fall and

14    reminded him of his Final Warning status. (Dkt. No. 13-1 at 5.)

**J.    Incident Involving Juan Zabala that Resulted in Fall's Discharge**

16           On October 15, 2013, Fall was involved in an incident with Juan Zabala that resulted in

17    Fall's discharge from employment. (Dkt. No. 12 at 8.) Fall delivered bags to an airplane less than

18    twenty minutes before the plane's departure and Delta employee Juan Zabala complained that

19    the bags were late. (Dkt. No. 14-1 at 56–57.) Fall explained that the bags were late because of an

20    error on the screen showing gate assignments. (*Id.* at 57.) According to Zabala, during the

---

[4] Fall contacted the Port of Seattle Police, who are located at the airport, and reported the incident. (Dkt. No. 15 at 7.)

[5] During the incident, Morrison radioed up to Blake Liukkonen, who controlled the camera, asking him to pan over to the aftermath of the near-collision. (Dkt. No. 13-3 at 4.)

[6] The videographer continued to monitor Fall by camera and described him as driving at unsafe speeds as he left the incident. (Dkt. No. 13-3 at 4.)

[7] The Workplace Violence Investigative Summary stated, "We were able to substantiate that Harouna Fall quickly approached the truck that Tracy Morrison was in and leaned into the vehicle in an aggressive manner. Harouna denies taking that action." (Dkt. No. 13-3 at 5.)

conversation Fall got close to his face, yelling "don't tell me how to do my job" so loudly that passengers looked out the window to watch, and moved his hands in a way that made Zabala feel threatened and insecure. (Dkt. No. 13-3 at 7.) Fall does not deny that he was loud or that he was "using his hands when talking," but indicates that the incident occurred in a very noisy place at the airport and it is very hard to hear anyone unless they yell or talk loudly. (Dkt. No. 15 at 7; Dkt. No. 16-10 at 1–2.)

Delta suspended Fall while it investigated the incident. (Dkt. No. 12 at 8.) Delta obtained statements from Fall, Zabala, and two employees who witnessed the incident. (Dkt. No. 13-3 at 7, 9, 11, 12) Human Resources specialists and managers from the Seattle Airport Customer Service Department reviewed the investigation results and Fall's disciplinary history; both groups ultimately recommended his termination. (Dkt. No. 13-3 at 14–15, 22, 24.) In accordance with the recommendation, Delta terminated Fall's employment on November 7, 2013. (Dkt. No. 13-3 at 24.)

**K.      Procedural History**

After his termination, Fall appealed to Delta's internal Equal Opportunity & Compliance Department ("EO"). (Dkt. No. 13-3 at 26.) The EO Department considered his appeal, but ultimately found he was lawfully terminated "for failing to meet Delta's standards and expectations." (*Id.*) The Department found that his claims of race and national origin discrimination lacked merit. (*Id.*)

On October 23, 2013, during his suspension from the Zabala incident, Fall filed a complaint with the Equal Employment Opportunity Commission ("EEOC"). (Dkt. No. 14-1 at 61.) After investigation, the Regional Director recommended closing the claim because, among other grounds, Fall's race- and religion-based harassment claims were untimely. (*Id.* at 63, 65.)

On February 23, 2015, Fall filed this lawsuit in King County Superior Court. (Dkt. No. 1). Delta removed the case to federal court. (*Id.*) Delta moves the Court to grant summary judgment and dismiss all the claims with prejudice. (Dkt. No. 12.)

## II.   STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (internal citations omitted). One of the principal purposes of the summary judgment rule is to "isolate and dispose of factually unsupported claims." *Id.* at 323–24.

Therefore, once a motion for summary judgment is properly made and supported, the opposing party "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). Failure of proof concerning an essential element of the nonmoving party's claim necessarily renders all other facts immaterial and entitles the moving party to judgment as a matter of law. *Celotex*, 477 U.S. at 323.

## III.   DISCUSSION

In his complaint, Fall alleges two causes of action against Delta. First, Fall alleges discrimination on the basis of race, national origin, and religion under Washington State Law and Title VII of the 1964 Civil Rights Act, as modified by Title I of the 1991 Civil Rights Act. (Dkt. No. 4 at ¶ 15.) Fall's theories of violation are construed as hostile work environment claims and disparate treatment claims under both the WLAD and Title VII. (Dkt. No. 4 at ¶ 15.) Second, Fall alleges wrongful discharge under Washington law and common law. (Dkt. No. 4 at ¶ 18.)

### A.   Statute of Limitations

As a threshold matter, Delta contends that some of Fall's claims are barred by the applicable statutes of limitations. To determine when a statute of limitations begins to run, courts classify acts of discrimination as either a "discrete act" of discrimination or retaliation, or as part

1    of a continuous "hostile work environment." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S.

2    101, 111–14 (2002). Under Washington law, the statute of limitations begins to run when a

3    discrete act of discrimination or retaliation occurs. *Antonius v. King County*, 103 P.3d 729, 732

4    (Wash. 2004). However, hostile work environment claims only require that one of the acts

5    contributing to such an environment occur within the statute of limitations period. *Id.*

6         Discrete discriminatory acts are not actionable if they occurred outside the statutory

7    period, even if related to acts that are the subject of a timely-filed charge. *Id.* Examples of a

8    discrete unlawful employment practice include termination, suspension, failure to promote,

9    denial of transfer, or refusal to hire; these cannot qualify as related acts, and are not cognizable

10   unless they themselves occur within the limitations period. *Morgan*, 536 U.S. at 108–13;

11   *Antonius*, 103 P.3d at 733–34. Alternately, a hostile work environment claim involves repeated

12   conduct, which can span over a series of days or years. *Morgan*, 536 U.S. at 115. For this type of

13   claim, if one act contributing to the hostile work environment occurs within the filing period,

14   then all acts contributing to the claim may be considered for purposes of determining liability. *Id.*

15   at 117.

16        Under Title VII of the Civil Rights Act, a plaintiff must first file a charge of

17   discrimination with the Equal Employment Opportunity Commission ("EEOC"). 42 U.S.C.

18   § 2000e–5(e)(1) (2009); *E.E.O.C. v. Dinuba Med. Clinic*, 222 F.3d 580, 585 (9th Cir. 2000). A

19   plaintiff must file a charge with the EEOC within 180 days of the alleged unlawful employment

20   practice, or 300 days where a state agency has subject matter jurisdiction over the charge and the

21   plaintiff initially files the charge with the state agency. § 2000–5(e)(1). A claim filed outside of

22   these deadlines is time-barred. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002).

23   Fall filed a charge with the EEOC rather than a state agency on October 23, 2013 and therefore

24   the 180-day time period applies. *Bataille v. Spokane Falls Cmty. Coll.*, No. 11-cv-0442-TOR,

25   2012 WL 6192663, at *2–3 (E.D. Wash. Dec. 12, 2012); Dkt. No. 14-1 at 61. Thus, the relevant

26   cut-off date concerning Fall's Title VII claims was April 26, 2013.

1    In addition to his federal claims, Fall brings state law claims under the Washington Law

2    Against Discrimination ("WLAD"). Discrimination claims under WLAD are subject to a three-

3    year statute of limitations. *Antonius v. King Cty.*, 103 P.3d 729, 732 (2004); Rev. Code Wash.

4    § 4.16.080(2). Like with Title VII claims, Washington uses the *Morgan* standard, which

5    distinguishes discrete and continuous acts for the purposes of determining the statute of

6    limitations. *Antonius*, 103 P.3d at 732. Thus, the relevant statute of limitations date concerning

7    Fall's state claims was February 23, 2012; three years before Fall filed his lawsuit.

8         Based on the applicable statute of limitations dates, the following events fall within the

9    statutory periods for purposes of the Title VII claim and the WLAD claims: (1) the Tracy

10   Morrison incident on June 2, 2013, (2) the Juan Zabala incident on October 15, 2013; and (3)

11   Fall's discharge. Additionally, the Elisabeth Blake incident in March 2012 may be considered

12   under the WLAD claim. However, the remaining factual allegations may not be considered

13   unless they sufficiently allege a hostile work environment action with one of the acts

14   contributing to such environment occurring within the statute of limitations period. *Antonius v.*

15   *King County*, 103 P.3d 729, 732 (Wash. 2004).

16   **B.    Hostile Work Environment**

17         Fall alleges that he was subjected to a hostile work environment on the basis of his

18   religion, race, and national origin and, accordingly, that all the facts in the record may be

19   considered. (Dkt. No. 15 at 10–11.) Delta argues that Fall cannot establish a hostile work

20   environment and that the Court may not consider the alleged acts or events occurring prior to

21   October 23, 2013 (Title VII) and/or February 23, 2012 (WLAD).

22         The analysis for a hostile work environment claim is the same under Title VII and

23   WLAD because Washington adopted the *Morgan* test. *Antonious*, 103 P.3d at 737. A hostile

24   work environment is a species of intentional discrimination that is "ambient, persistent, and

25   continues to exist between overt manifestations." *Draper v. Coeur Rochester, Inc.*, 147 F.3d

26   1104, 1108 n. 1 (9th Cir. 1998). To prevail under a hostile work environment claim premised on

1   either race or sex, a plaintiff must meet a high burden and show: (1) that he was subjected to

2   conduct of a harassing nature based on his race, national origin, or religion; (2) that the conduct

3   was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the

4   conditions of the plaintiff's employment and create an abusive work environment.[8] *Vasquez v.*

5   *County of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003). To determine whether conduct was

6   sufficiently severe or pervasive as to violate either Title VII or WLAD, a reviewing Court

7   examines "all the circumstances, including the frequency of the discriminatory conduct; its

8   severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

9   whether it unreasonably interferes with an employee's work performance." *Vasquez*, 349 F.3d at

10  642 (quoting *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 270–71 (2001)). "In addition, the

11  working environment must both subjectively and objectively be perceived as abusive." *Vasquez*,

12  349 F.3d at 642.

13          Ninth Circuit law establishes a high burden before finding a "hostile work environment."

14  In *Vasquez*, the Ninth Circuit discussed other hostile work environment cases in determining that

15  the events at issue were not severe or pervasive enough to violate Title VII. *Vasquez*, 349 F.3d at

16  643. For example, in *Draper v. Coeur Rochester, Inc.*, the Ninth Circuit found that the defendant

17  created a hostile work environment where the plaintiff's supervisor made repeated sexual

18  remarks about the plaintiff over a two-year period, called her "gorgeous" and "beautiful" rather

19  than her name, told her about his sexual fantasies and his desire to have sex with her,

20  commenting on her "ass," and asking over a loudspeaker if she needed help changing clothes.

21  147 F.3d 1104 (9th Cir. 1998). *Nichols v. Azteca Restaurant Enterprises, Inc.* held that an

22  employer's actions were sufficiently severe and pervasive when a male employee of a restaurant

23  was subject to a relentless campaign of insults, name-calling, vulgarities, and taunts of "faggot"

24

25  [8] The elements to prove a hostile work environment are the same for both racial harassment and sexual

26  harassment; therefore, cases analyzing both types of harassment are relevant to the analysis. *Vasquez*, 349 F.3d at 642.

ORDER GRANTING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT
PAGE - 12

and "fucking female whore" by male co-workers and supervisors at least once a week and often several times a day. 256 F.3d 864 (9th Cir. 2001). However, in *Sanchez v. City of Santa Ana*, the Ninth Circuit held that no reasonable jury could have found Latino police officers were subject to a hostile work environment despite allegations that the employer posted a racially offensive cartoon, made racially offensive slurs, targeted Latinos when enforcing rules, provided unsafe vehicles to Latinos, did not provide adequate police back-up to Latino officers, and kept illegal personnel files on plaintiffs because they were Latino. 936 F.2d 1027 (9th Cir. 1990). And, in *Kortan v. California Youth Authority*, the Ninth Circuit found no hostile work environment existed when a supervisor called female employees "castrating bitches," "Madonnas," or "Regina" on several occasions in plaintiff's presence; the supervisor called the plaintiff "Medea," the plaintiff complained about other difficulties with that supervisor, and the plaintiff received letters at home from the supervisor. 217 F.3d 1104 (9th Cir. 2000).[9]

Here the factual allegations do not rise to the severe and pervasive level of a hostile work environment; rather, they are discrete, unrelated events. While Fall argues that at least three specific events suggest a hostile work environment, the Court examines "all the circumstances" when determining the subjective and objective prongs of this test. *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81 (1998). After considering all of the material facts in the record, the Court concludes that Fall has not established that he was subjected to a hostile work environment. First, Fall's claim for discrimination on the basis of religion does not establish a continuing pattern of behavior. Fall argues that Rebecca Tuialuulu intentionally threw away Fall's prayer mat because she thought it was trash. (Dkt. No. 15 at 2.) Even if this incident were considered intentional discrimination, it represents a single occurrence, not evidence of an ongoing, hostile environment.

---

[9] Many of these case summaries come from *Kapu v. Sears, Roebuck and Co.*, 2010 WL 2963339 *8 (D. Hawaii 2010), which succinctly summarized the Ninth Circuit's case summaries from *Vasquez*, 349 F.3d at 634.

1     Second, Fall's argument regarding a hostile work environment on the basis of race and/or

2  national origin fails because the facts are not objectively severe or pervasive. Except for two

3  incidents involving Jonathan Raab, each incident involved a different primary offender: Rebecca

4  Tuialuuluu, Amin Rashid, Scott Langford, Ron Wooten, Elizabeth Blake, and Tracy Morrison.

5  (Dkt. No. 12 at 17.) Further, many of the incidents were separated by a span of months and Fall

6  offered no evidence that these events occurred on a daily or even weekly basis. (Dkt. No. 12 at

7  17.) While the encounter between Fall and Elisabeth Blake was hostile, even those events fail to

8  establish a hostile work environment as a matter of law. Accepting Fall's version of events as

9  true, the record would establish that Blake called Fall names and resented his supervisory

10  authority for several days prior to the March 6, 2012 event. (Dkt. No. 16-6 at 1–2.) However,

11  particularly in light of Ninth Circuit law demonstrating the difficulty of meeting this standard,

12  the offensive language used does not rise to the level of a hostile work environment. *Vasquez*,

13  349 F.3d at 642.

14     Lastly, even if these events did meet the objective prong of the hostile work environment

15  test, the acts were interrupted by management intervention and sanctions. Multiple Delta

16  managers investigated the incidents described above, and several others—including personnel

17  from Human Resources, Corporate Security, maintenance, and the EEOC—participated in the

18  investigation and in some instances conducted their own. (Dkt. No. 12 at 5, 7, 8, 10, 11, 12, 17.)

19  For example, when Fall's co-worker Ron Wooten made an offensive race-based comment to Fall

20  in the presence of manager Gail Drelling, Drelling reprimanded Wooten and further action was

21  taken by Delta. (Dkt. No. 12 at 11.) A few days later, manager Bill Green began an investigation

22  due to the serious nature of the comments and collected statements from Wooten, Drelling, and

23  Fall. (*Id.*) And Drelling, the manager present during the comment, was ultimately discharged for

24  her failure to immediately investigate the incident with appropriate severity. (*Id.*) Green's

25  investigation and escalation is significant because "intervention by an employer can destroy the

26  connection between earlier and later [unlawful] acts." *See Morgan*, 536 U.S. at 118; *Antonius*,

103 P.3d at 737. Despite the seriousness of Wooten's comments, this event was discrete, adequately investigated and dealt with, and is not linked by continuous unlawful employment actions.

Accordingly, Fall cannot establish a string of continuous and unlawful employment practices. Having failed to establish a hostile work environment, his discrimination claims are limited to the following:

1.   A WLAD claim for discrimination based on race and/or national origin arising out of the Elisabeth Blake incident in March 2012;

2.   Title VII and WLAD claims for discrimination based on race and/or national origin due to the Tracy Morrison Incident on June 2, 2012 and the Juan Zabala Incident; and

3.   Title VII and WLAD claims for wrongful termination of employment.

**C.   Disparate Treatment Claims**

The Court now turns to what remains of Fall's claims under Title VII and WLAD. Fall alleges that Delta unlawfully discriminated against him on the basis of his race, national origin, and/or religion. Because Fall does not meet the objective prong for a hostile work environment, the Court's review of his claims under Title VII and WLAD is limited to his disparate treatment theory. (Dkt. 4 at ¶ 15.)

Title VII makes it unlawful for an employer to discriminate on the basis of several protected classes, including race, national origin and religion. 42 U.S.C. § 2000e–2(a)(1). In order to prevail under Title VII, the plaintiff must establish a *prima facie* case of discrimination. *Coradova v. State Farm Ins. Cos.*, 124 F.3d 1145, 1148 (9th Cir. 1997).

To establish a *prima facie* case of disparate treatment in violation of Title VII, a plaintiff must establish that: (1) the plaintiff is a member of a protected class; (2) the plaintiff performed his or her job satisfactorily; (3) the plaintiff experienced an adverse employment action; and (4) similarly situated individuals outside of plaintiff's protected class were treated more favorably.

1   *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006.)

2         Like Title VII, WLAD makes it an unfair practice for an employer to discriminate on the

3   basis of race, national origin, or religion. Rev. Code Wash. § 49.60.180. To establish a *prima*

4   *facie* case of racial discrimination based on disparate treatment under WLAD, the plaintiff must

5   show that: (1) the plaintiff belongs to a protected class; (2) the plaintiff was treated less favorably

6   in the terms of conditions of his or her employment (3) than a similarly situated, non-protected

7   employee, and (4) the plaintiff and the non-protected "comparator" were doing substantially the

8   same work. *Washington v. Boeing*, 19 P.3d 1041, 1048 (2000).

9         Upon a plaintiff establishing a *prima facie* violation, both WLAD and Title VII use the

10   *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp v. Green*, 411 U.S.

11   792 (1973); *Grimwood v. Univ. of Puget Sound, Inc.*, 753 P.2d 517, 521 (1988). If the plaintiff

12   succeeds in establishing a *prima facie* case, then the burden shifts to the defendant to articulate a

13   legitimate, nondiscriminatory reason for its allegedly discriminatory conduct; if the defendant

14   provides such a reason, the burden shifts back to the plaintiff to show that the employer's reason

15   is a pretext for discrimination. *Vasquez v. County of Los Angeles*, 349 F.3d 634, 640 (9th Cir.

16   2003); *Grimwood*, 753 P.2d at 521 (holding the burden remains at all times on the plaintiff, but

17   after a *prima facie* showing the employer has a burden of production in which it must articulate a

18   legitimate, non-discriminatory reason for termination). As discussed below, Fall cannot make a

19   *prima facie* case for disparate treatment and, accordingly, the Court need not reach the remainder

20   of the burden-shifting analysis.

21   **1.     Religious Discrimination Claims**

22         First, the Court addresses Fall's disparate treatment claims based on religion. Fall

23   concedes in his deposition that the only incident of alleged religious discrimination he

24   experienced was the incident involving Rebecca Tuialuuluu throwing away his prayer mat. (Dkt.

25   No.14-1 at 51–52). This event occurred in November 2010, well outside of the statutory period.

26   (Dkt. No. 15 at 2.) Fall cannot make a *prima facie* showing of disparate treatment on the basis of

1   religion because the facts within the statutory period do not implicate religious discrimination.

2   Further, Fall has not made a showing that he was treated disparately compared to a person of

3   another religion. Accordingly, summary judgment in Delta's favor is appropriate over Fall's

4   religious discrimination claims under Title VII and WLAD.

5   **2.      Race and National Origin-Related Claims**

6           Second, the Court turns to Fall's claims for disparate treatment based on his race and

7   national origin.

8           First, the Court examines the facts surrounding the Elisabeth Blake incident in March

9   2012. Delta argues that Fall fails to make a *prima facie* showing of disparate treatment because

10  Fall indentifies no other Delta employee outside his protected classes who were treated

11  differently either in the manner of the investigation or the lack of discipline imposed. (Dkt. No.

12  19 at 6.) Under WLAD,[10] a plaintiff alleging disparate treatment must put forth evidence that

13  "plaintiff was treated less favorably in the terms of his employment than similarly situated non-

14  protected employees." *See, e.g.*, *Domingo v. Boeing Employees' Credit Union*, 124 Wash. App.

15  71, 80 (Wash. App. 2004). While Fall compares his treatment to Blake's after the incident, no

16  evidence suggests that she received different treatment than Fall. Delta investigated the incident,

17  considered statements from both Fall and Blake, and solicited statements from other employees.

18  (Dkt. No. 13-5 at 9–18; Dkt. No. 12 at 6.) Delta did not discipline either employee because the

19  investigation was inconclusive. (Dkt. No. 12 at 6.) In conclusion, Fall has not made a *prima facie*

20  showing of disparate treatment resulting from this single incident.

21          Next, the Court considers the Title VII and WLAD claims related to the Tracy Morrison

22  incident on June 3, 2013. Fall claims that he received disparate treatment on the basis of his race

23

24  [10] The Court analyzes this incident under Fall's WLAD claim; Title VII is inapplicable because the

25  incident falls without the relevant period for the statute of limitations. However, even if this claim was
    eligible for consideration under Title VII the result would be the same because Plaintiff has not

26  adequately demonstrated that "similarly situated individuals outside of plaintiff's protected class were
    treated more favorably." *Cornwell*, 439 F.3d at 1028.

ORDER GRANTING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT
PAGE - 17

1  and national origin after reporting the incident; however Fall again fails to offer any evidence

2  that a "similarly situated individual outside of plaintiff's protected class was treated more

3  favorably." *Cornwell*, 439 F.3d at 1028. Fall fails to make any comparison between the way he

4  was treated and the way a similarly situated non-protected employee was treated that would

5  suffice under either Title VII or WLAD. Fall's argument fails to establish a *prima facie* showing

6  that he received disparate treatment on the basis of his race or national origin from this discrete

7  incident.

8    Lastly, the Court considers the Title VII and WLAD claims related to the Juan Zabala

9  incident on October 15, 2013, which led to Fall's discharge. Fall argues that "Delta

10  independently concluded without the basis of any evidence, that Mr. Fall threatened or yelled at

11  Mr. Zabala, even though they were in the loudest part of the airport and it required people to yell

12  to communicate." (Dkt. No. 15 at 13.) Fall also argues that the video was altered in some way

13  and is thus an unreliable depiction of the events that day. Whether the video was altered is not a

14  material fact that needs to be resolved, because Fall failed to make a comparison between the

15  way he was treated and the way a similarly situated non-protected employee was treated in order

16  to substantiate his claims under Title VII or WLAD.

17    In sum, Fall argues that the totality of these incidents demonstrate that he was treated in a

18  disparate manner and that the basis was his religion, race, and/national origin. (Dkt. No. 15 at

19  14.) However, Fall fails to point out a single similarly situated employee outside of his protected

20  class who was treated differently. Fall offers the declaration of Adrian Kuchta[11] as evidence of

21  disparate treatment, but this evidence does not establish a *prima facie* case of disparate treatment.

22  (Dkt. No. 18.) Kutcha's declaration describes several employees' terminations, including his

23  own. (*Id.*) The declaration states that some employees received severance packages when they

24  left the company and that other employees did not. (Dkt. No. 18.) However, the declaration does

25  _____

26  [11] Fall filed this declaration in support of his arguments; however, Fall's brief never references this declaration or indicates how it might help him establish a *prima facie* case.

ORDER GRANTING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT
PAGE - 18

1    not establish that these employees were (under Title VII) "similarly situated individuals outside

2    plaintiff's protected class" or that they were (under WLAD) "similarly situated, non-protected

3    employee[s] . . . doing substantially the same work." *Cornwell*, 439 F.3d at 1028; *Washington*,

4    19 P.3d at 1048. Because Fall did not "come forward with 'specific facts showing that there is a

5    genuine issue for trial[,]'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, summary judgment in

6    Delta's favor over his claims under Title VII and WLAD is appropriate.

7    **3.    Wrongful Discharge Claim**

8           In Count II of his complaint, Fall alleges that he was wrongfully discharged in violation

9    of Washington law and common law.[12] The Court construes this claim as the tort of wrongful

10   discharge in violation of public policy,[13] which constitutes a narrow exception to the

11   employment at will doctrine. *Rickman v. Premera Blue Cross*, 358 P.3d 1153, 1158 (2015). To

12   establish wrongful discharge, the plaintiff must meet four elements: (1) the existence of a clear

13   public policy (the clarity element); (2) that discouraging the conduct in which the plaintiff

14   engaged would jeopardize the public policy (the jeopardy element); (3) that the public-policy-

15   linked conduct caused the dismissal (the causation element); and (4) that the defendant has not

16   offered an overriding justification for the plaintiff's dismissal (the absence of justification

17   element). *Id.* (quoting *Gardner v. Loomis Armored, Inc.*, 913 P.2d 377 (1996)) (internal

18   quotations omitted).

19          Fall's complaint alleges that he was terminated "when he attempted to exercise his rights

20   by reporting the illegal and discriminatory behavior of the Defendants." (Dkt. No. 4 at 6.) Delta

21   argues that Fall's claim fails because Fall has not identified what public policy is at stake, and

22   because Fall cannot establish the causation and absence of justification elements. (Dkt. No. 12 at

23

24   [12] In his complaint Fall alleges: "As a result of the unlawful practices of the Defendants, the plaintiff was

25   wrongfully terminated from his employment with the Defendants in violation of state and common law when he attempted to exercise his rights by reporting the illegal and discriminatory behavior of the defendants." (Dkt. No. 4 at ¶ 18.)

26   [13] Delta construes the claim as wrongful discharge in violation of public policy in its briefing (Dkt. Nos. 12 and 19.) Fall does not address the wrongful termination claim in his response. (Dkt. No. 15.)

26.) The Court agrees. Delta terminated Fall because he engaged in a verbal altercation with Juan Zabala while on Final Warning status, after a history of incidents violating Delta's workplace violence policy. (Dkt. No. 13-3 at 24.) Further, Fall did not address his wrongful discharge claim in his response briefing. (Dkt. No. 15). Once a motion for summary judgment is properly submitted and supported, the opposing party "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). Fall does not point to any genuine material issues of fact that need be resolved at trial. Therefore, summary judgment in Defendants' favor over Fall's wrongful discharge claim is appropriate.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion for Summary Judgment (Dkt. No. 12) is GRANTED. Plaintiff's claims are hereby dismissed with prejudice. The Clerk is directed to CLOSE this case.

DATED this 20th day of May 2016.

John C. Coughenour
UNITED STATES DISTRICT JUDGE

ORDER GRANTING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT
PAGE - 20